UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EDWIN ROJAS and MAGALIA ROJAS, | ) | |
| | ) | |
| Plaintiffs, | ) | 16 C 2982 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| X MOTORSPORT, INC., OFFICER BANASZEWSKI, | ) | |
| VILLAGE OF VILLA PARK, BRANKO VECEVIC, | ) | |
| ZAIA RASHO, and DERRICK JOHNSON, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

> Most depositions are taken without judicial supervision. Witnesses often want to avoid giving answers, and questioning may probe sensitive or emotionally fraught subjects, so unless counsel maintain professional detachment decorum can break down. That happened here; the results were ugly.

*Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007). And so, here, as well.

Edwin and Magalia Rojas brought this suit against X Motorsport, Inc. and several of its employees (collectively, "X Motorsport"), and also the Village of Villa Park and Villa Park police officer Bart Banaszewski (together, "Villa Park Defendants"), alleging federal and state claims arising from what they say was their unlawful detention at the X Motorsport car dealership on January 23, 2016. Doc. 56. This suit is related to a second one that Edwin brought against X Motorsport, which alleged a violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and which concluded with the entry of summary judgment against him. *Rojas v. X Motorsport, Inc.*, 2017 WL 2404953 (N.D. Ill. June 2, 2017). The court's opinion in the TILA suit describes what brought Edwin and Magalia to the dealership, though this suit involves not the financial aspects of Edwin's purchase of a vehicle, but rather Edwin and Magalia's claim that X Motorsport staff, in conjunction with Officer Banaszewski, would not let them leave until they

1

agreed to resolve a dispute over the vehicle's return.  Edwin and Magalia have claimed that they suffered emotional distress from their alleged confinement.

Now before the court are cross-motions for sanctions arising from the depositions of Magalia and her husband, non-party Onesimo Rojas.  Plaintiffs ask the court to invoke its inherent authority to sanction X Motorsport's counsel, Jill Lewis, for telling Blake Horwitz, Plaintiffs' attorney, to "shut up" and to "shut [his] big fucking mouth" during the deposition.  Doc. 129.  X Motorsport asks the court to sanction Horwitz under Federal Rule of Civil Procedure 30(d)(2) for what it says were his persistent violations of Rule 30(c).  Doc. 132.

I.     **X Motorsport's Sanctions Motion**

At Onesimo's deposition, Lewis represented X Motorsport, Alison Harrington represented the Villa Park Defendants, and Horwitz represented Plaintiffs and Onesimo.  Doc. 137.  At one point, Horwitz instructed Onesimo to not answer a question posed by Lewis:

> Q [Ms. Lewis].  Do you have a dog?
>
> A.  Yes, I do.
>
> Q.  What kind of dog?
>
> A.  I don't want to answer these questions.
>
> Q.  Why?
>
> A.  Because they have nothing to do with the case.
>
> Q.  I would like to know what kind of dog you have.
>
> MR. HORWITZ:  Hold it.  I think the question is harassing.  It has nothing to do with the case.  Let's move on.  You can certify and ask the judge.  I think asking him what kind of dog he has nothing to do with the case, okay.
>
> MS. LEWIS:  Okay.  I disagree.
>
> MR. HORWITZ:  I can tell you that my clients are nervous being here and this is —
>
> MS. LEWIS:  Aren't we all.

>MR. HORWITZ: I'm making a record.
>
>MS. LEWIS: Why? A record for what? Let's move on.
>
>MR. HORWITZ: I'm going to talk. I'm going to talk so you just tell me when you're done. Are you done? I assume you're done.
>
>MS. LEWIS: Sir, did someone come to the —
>
>MR. HORWITZ: I'm talking.
>
>MS. LEWIS: He's going to have to come back because you keep talking.
>
>MR. HORWITZ: Do whatever you want to do. You're going to be done shortly.
>
>MS. LEWIS: Talk as long as you want. Go ahead.
>
>MR. HORWITZ: My clients are nervous being here for many, many, many, many reasons including last night police officers and agents came to their home to serve a subpoena on this man, he says, for deposition that is occurring today. My client's wife has a nervous condition. I have let you guys know about this. Ask relevant questions. Asking about his dog is not okay. Let's move on.

*Id.* at 35:2-36:18.

Moments later, Horwitz instructed Onesimo not to answer Lewis's questions regarding Magalia's condition, and then took over the examination on that topic and limited it to three questions that he decided to ask:

>Q. Okay. Was your wife [Magalia] involved in an accident in the past year?
>
>MR. HORWITZ: Hold on, what's the purpose of asking that question? What's the — how is it connected to anything pursuant to Rule 26? We're not claiming anything like that.
>
>MS. LEWIS: Okay.
>
>MR. HORWITZ: So you're asking about a medical condition that has nothing to do with this case so why are you asking?
>
>MS. LEWIS: It does have something to do with it because you said she couldn't come in here for a long time because of it.

3

MR. HORWITZ: But that doesn't have to do with discovery, doesn't have to do with this case.

MS. LEWIS: Are you instructing him not to answer?

MR. HORWITZ: Right now I'm having a 37.2 with you.

MS. LEWIS: I want to know the answer to that question.

MR. HORWITZ: Absent any communication attributable to why it has anything to do with this case, I'm going to instruct him to not answer the question because of privacy grounds, privacy privilege.

MS. LEWIS: Well then I'm guessing the answer is no.

MR. HORWITZ: You can guess whatever you like. I'm instructing him not to answer the question.

Q. Does your —

MR. HORWITZ: Also I don't lie — excuse me, I don't lie to a judge.

A. I'm sorry, what is the question?

Q. Does your wife have a shoulder injury?

A. Again, I don't want to answer that. It has nothing to do with this case.

MR. HORWITZ: Moving on.

A. It's a personal case.

…

Q. What does that mean, it's a personal case.

A. It's private.

Q. What's private?

MR. HORWITZ: Stop. Ask another question. Ask another question. Don't ask him any more questions. I'm instructing him not to answer these questions unless you need it as a precursor to issues attributable to representations before the judge for which you have told me you don't care, for which you have said on the record you don't care, none of this is at issue unless she [Magalia] doesn't appear. She's here, she's ready to go. If you are now telling me it is at issue in order to deal with representations that you have previously told the judge are not at issue, then please let me know.

4

> Q. Okay. Your wife has filed a lawsuit and I'm entitled to find out information about her including her physical condition, her mental condition, and I would like to know if she has a shoulder injury.
>
> MR. HORWITZ: You can answer that question generally. Generally.
>
> A. No, I do not want to answer it.
>
> MR. HORWITZ: I am saying to you, my recommendation is you just answer that question generally.
>
> …
>
> MR. HORWITZ: Why don't you let me do it. Does your wife have a shoulder injury? Has she injured her shoulder at some time a while ago?
>
> A. Yes.
>
> MR HORWITZ: Has she received medical treatment for her shoulder injury?
>
> A. Yes.
>
> MR. HORWITZ: Is it your understanding that she receives medication as well for the pain for her shoulder?
>
> A. Yes.
>
> MR. HORWITZ: Okay. That's the extent that I will allow this level of inquiry unless you think it's important to go further for something that's connected to this case. There is no claim that her shoulder injury has anything to do with this case.

*Id*. at 41:13-45:7.

Horwitz's instructing Onesimo not to answer Lewis's questions was improper. Rule 30(c)(2) states:

> An objection at the time of the examination—whether to … the manner of taking the deposition, or to any other aspect of the deposition—must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection. An objection must be stated concisely in a nonargumentative and nonsuggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).

Rule 30(d)(3)(A), in turn, states:

5

> At any time during a deposition, the deponent or a party may move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party. … If the objecting deponent or party so demands, the deposition must be suspended for the time necessary to obtain an order.

Rule 30(c)(2) thus provides only three justifications for instructing a deponent not to answer a question: to preserve a privilege; to enforce a limitation imposed by the court; or to present a Rule 30(d)(3) motion. A violation of Rule 30(c)(2) may be remedied under Rule 30(d)(2), which states that a court may "impose an appropriate sanction … on a person who impedes, delays, or frustrates the fair examination of [a] deponent."

*Redwood v. Dobson*, *supra*, well illustrates the operation of these Rules. Danner, the deposing attorney, asked a series of irrelevant and irritating questions that "got under [the] skin" of Gerstein, the deponent. 476 F.3d at 467. "After Gerstein spontaneously refused to answer some of the questions (remarking 'That's none of your business'), Webber [Gerstein's attorney] began instructing Gerstein not to answer." *Ibid*. As the Seventh Circuit explained: "Webber gave no reason beyond his declaration that the questions were designed to harass rather than obtain information—which may well have been their point, but [Rule 30] specifies how harassment is to be handled. Counsel for the witness may halt the deposition and apply for a protective order, but must not instruct the witness to remain silent." *Id*. at 467-68 (citation omitted). "Webber violated this rule repeatedly by telling Gerstein not to answer yet never presenting a motion for a protective order. The provocation was clear, but so was Webber's violation." *Id*. at 468; *see also Medline Indus. v. Lizzo*, 2009 WL 3242299, at *1-2 (N.D. Ill. Oct. 6, 2009) (holding that "instructing [a] deponent not to answer based on relevance … is improper"). Reversing the district court, which declined to sanction Webber, the Seventh Circuit censured him "for conduct unbecoming a member of the bar." *Redwood*, 476 F.3d at 470. As the Seventh Circuit observed, Webber was "goaded, but [his] response[]—… instructions not to

respond that neither shielded a privilege nor supplied time to apply for a protective order—were unprofessional and violated the Federal Rules of Civil Procedure as well as the ethical rules that govern legal practice." *Id.* at 469.

The only difference between this case and *Redwood* is that Danner's questions in *Redwood* were undeniably irrelevant and harassing—at one point, Danner asked Gerstein whether he had been "involved in any type of homosexual clique," whatever that means. *Id.* at 468. By contrast, Lewis's question about Magalia's shoulder injury was at least arguably relevant; she claims that she has suffered as a result of the events at X Motorsport, and the question concerned another potential source of her ills. It is hard to see how Lewis's question about Onesimo's dog was relevant, but it was at worst a harmless detour. But regardless of the questions' relevance, arguable or otherwise, Horwitz's instructing Onesimo not to answer violated Rule 30(c)(2). If those violations had ceased with Onesimo's deposition, sanctions might not have been warranted. However, things only went downhill later that day during Magalia's deposition.

Horwitz's improper instructions not to answer began almost immediately, when Harrington asked Magalia, who as noted claims emotional distress from what happened at the dealership, about the medications she was taking:

> Q. According to your complaint, the incident happened on January 23rd, 2016. Do you understand that?
>
> A. Yes.
>
> Q. Were you on any medications on January 23rd, 2016?
>
> A. Yes. I've always been under medication.
>
> Q. Can you tell me what medications you would have taken on January 23rd, 2016?
>
> A. I take three types of medication. Lexapro, Risperdal, and Lorazepam.

7

Q. And did you take Lexapro on January 23rd, 2016, before going to the car dealership?

A. I had not taken it at the moment.

Q. When did you normally take your medication?

A. Normally I take them at night to wake up in the morning.

Q. Would you have taken your medications, the Lexapro, the Risperdal and Lorazepam then the evening of January 22nd?

A. No. I take them before I go to bed.

Q. Then is it fair to say you would have taken the medications that you listed, Lexapro, Risperdal and Lorazepam on January 22nd, 2016, before you went to bed?

A. Before I went to bed, yes.

Q. And did you take those same medications last night before you went to bed?

A. Yes.

Q. After the incident at the car dealership on January 23rd, 2016, did any physician change the dosages of the medications that you took, Lexapro, Risperdal or Lorazepam?

MR. HORWITZ: Don't answer that question. Next question. We're not claiming psychiatric injuries. It's a garden variety injury. Getting into her psychiatric state beyond what you have done would go beyond the garden variety complain—garden variety claim of damages as it is construed in the case law. I specifically provided you garden variety language in the answers to the interrogatories and we're sticking with garden variety. There's a bunch of case law on it and in essence that would be going beyond the purview of garden variety.

MS. HARRINGTON: We'll note the objection. We'll show it as certified.

BY MS. HARRINGTON:

Q. Did you understand the question that I asked?

MR. HORWITZ: You don't have to answer the question because I have explained to her the law in my opinion and it's not necessary for you to answer that question.

BY MS. HARRINGTON:

8

> Q. Are you going to follow the instructions of your attorney not to answer the question?
>
> A. I'm going to follow the instructions of my attorney.

Doc. 136 at 6:16-9:1.

Later, when Harrington asked Magalia about what happened at the dealership, Horwitz again instructed her not to answer:

> Q. Can you tell me then—your son goes into this office, you are in the showroom or outside in the showroom area. Can you tell me how you learned something was going on?
>
> A. I never said that anything was going on. I said he went into an office.
>
> Q. Right. But we filed a lawsuit that indicates something happened at the dealership, correct.
>
> MRS. MAGALIA ROJAS: (Speaking in Spanish.)
>
> MR. HORWITZ: Hold on. Ask another question. Just ask the question. She filed a lawsuit because they talked to me, I'm an attorney, I file lawsuits when people identify these in this scenario of a federal civil rights violation and other things so let's just move on to another question.
>
> MS. HARRINGTON: Can I just have an answer? Was there a yes?
>
> MR. HORWITZ: I'm going to instruct her not to answer the question. Move on.

*Id.* at 31:7-32:3.

Immediately after Lewis began questioning Magalia, Horwitz again instructed her not to answer:

> Q. Mrs. Rojas, my name is Jill Lewis. I'm going to be asking you a few questions, okay?
>
> A. That's fine.
>
> Q. Okay. What is Edwin's date of birth?
>
> A. March 7th. I don't remember the year.
>
> Q. What is Evelyn's date of birth?

9

MR HORWITZ: We can provide you the names and dates of birth. I would ask that you move on to relevant testimony. I'll secure the information and tender it to you so we don't have to waste time doing this with this witness. I'll get you the information. Can we agree? As my client is sitting here crying and trying to make sure she is able to answer questions. Can you agree, counsel, that that's how it will be done? I'll provide you the names and dates of birth. Can you agree to that or no?

MS. LEWIS: No.

MR. HORWITZ: Okay. I'm instructing her not to answer the question. You go do what you want to do. I'm going to provide you the information, as she's sitting here crying, I'm going to provide you the information. You do what you want to do. Ask the next question, please.

MS. LEWIS: I'm sorry, for the record, she got upset when you started talking.

BY MS. LEWIS:

Q. Mrs. Rojas, if you would prefer to come back on another day—

MR. HORWITZ: Excuse me, don't instruct my client—

MS. LEWIS: —and finish this deposition, I want you to know I'm fine with that and Mrs. Harrington is fine with that.

MR. HORWITZ: Please ask the next question. Don't instruct my client about what she's going to do with regard to the deposition.

MS. LEWIS: Please interpret.

THE INTERPRETER: Interpreter speaking, I can't interpret when two people are talking, especially when counsel is instructing that we shouldn't have her answer so I don't quite know what to do.

MR. HORWITZ: I'm going to instruct—I'm asking you to not interpret that. It is harassing to her. She's going to do her best right now—she's going to do her best right now to proceed forward and not come back because coming back would be with great difficulty. So what I'm asking you to do is ask a question. If you do not want to ask a question, then we're done. Don't instruct my client what to do relative to the deposition. That is—

MS. LEWIS: I'm not instructing her at all.

MR. HORWITZ: That is what I will do.

    MS. LEWIS: I'm not instructing her at all. I am merely telling her—I want her to know—

    MR. HORWITZ: If you want to ask another question—

    MS. LEWIS: —if she wants to come back—

    MR. HORWITZ: If you don't ask another question, we're gone.

    MS. LEWIS: — I am fine with that.

    MR. HORWITZ: If you don't ask another question, we're gone.

    MS. LEWIS: I want you to interpret that and tell her that.

    MR. HORWITZ: Please don't do that. Please leave it alone. Next question. I'll ask her to leave the room. We can talk all you want to about having—

    MS. LEWIS: Why won't you let me tell her that?

    MR. HORWITZ: All right, can you please have her leave the room.

    MS. LEWIS: Do not. Stop. Stop. This is outrageous.

    MR. HORWITZ: Ask another question.

    MS. LEWIS: I have never had an attorney tell me what I can and cannot ask. It's crazy. And I'm like this close to just stopping and taking the whole thing in front of the judge.

    MR. HORWITZ: Ask another question.

    MS. LEWIS: And saying, Judge, can we do this at your office?

    MR. HORWITZ: You got ten more seconds or we're gone so I'll leave it to you.

    MS. LEWIS: Ten more seconds to do what?

    MR. HORWITZ: To ask a question. Don't instruct me what to do. Ask a question.

*Id.* at 65:13-69:6. Horwitz's instruction to Magalia not to answer was improper, the extent of his antagonism toward Lewis unprofessional, his telling the interpreter not to interpret unjustified, and his misinterpretation of Lewis's actions as instructing Magalia, when she was doing no such thing, baffling.

There were additional improprieties by Horwitz. He repeatedly solicited testimony from Magalia after breaks regarding her mental state and level of anxiety, when he should have questioned her about those things only after Lewis and Harrington had concluded. *Id*. at 34:20-35:5, 42:13-22, 59:10-60:17. At one point, Horwitz interrupted the questioning in a way that was plainly designed to prompt Magalia to alter her answer:

> Q. After you picked up Edwin and returned to your house, did you go into your bedroom?
>
> A. In my bedroom.
>
> Q. And did you go into your bedroom by yourself to lay down or do what?
>
> A. No, I just watch TV.
>
> MR. HORWITZ: Excuse me, do you remember what you did at that moment in time on that day?
>
> MS. LEWIS: Excuse me, she's answering the questions. Why are you interjecting? That's improper.
>
> MR. HORWITZ: Because I think she's engaging in guesswork. Do what you need to do.
>
> (Witness speaking in Spanish to Mr. Horwitz.)
>
> MR. HORWITZ: I'm just asking if you actually remember.
>
> MS. LEWIS: I object to this.
>
> MR. HORWITZ: It's fine. Your objection is noted.
>
> A. To be honest, there are a lot of things I no longer remember.
>
> MR. HORWITZ: It's very, very important that you do not guess. You don't have to know the answer to a question all because it's being asked.
>
> MS. LEWIS: You already said that. I'm sure she comprehended that the first time.
>
> MR. HORWITZ: She's being educated because of her—
>
> MS. LEWIS: You already educated.
>
> MR. HOROWITZ: Stop it.

>MS. LEWIS: You stop it. Done. I'm done with you.

>MR. HORWITZ: Let's go.

>   (The witness and Mr. Edwin Rojas left the room.)

>MR. HORWITZ: Don't interrupt me when I'm talking to my client. It's disrespectful.

>MS. LEWIS: You've already made us wait here an hour.

>MR. HOROWITZ: Do what you want to do. Leave. Good-bye.

>MS. LEWIS: You want to pay me?

>MR. HOROWITZ: Go, go. Do what you want to do. We'll be back in a couple minutes.

>MS. LEWIS: You're rude, rude, rude.

*Id.* at 17:8-19:3.

About a half hour later, after Magalia testified that a police officer locked the dealership's door on the day in question, Horwitz abruptly called for a break; after the break, Magalia testified that she could not remember who locked the door:

>Q. Who locked the door [at the dealership]?
>
>A. The police officer and another person.
>
>Q. How many doors were locked?
>
>A. I don't know.
>
>Q. How many doors did you see get locked?
>
>A. The one that I was standing at.
>
>Q. And the police officer locked the door in front of you?
>
>A. Yes.
>
>Q. How did he lock the door? What did he do?
>
>A. With his hand.
>
>Q. And how did he lock the door?

13

A. My son was coming with the gentleman that he was talking to and then the police officer came and he spoke with my son, too, and then the police officer—the policer officer came and I was standing near the door. Then the police officer came and he locked the door. And then I told my son, call the police, call the police.

MR. HORWITZ: We're talking a break. I'll be right back shortly.

(Whereupon a brief recess was taken.)

MR. HORWITZ: Okay. I got to make a record. How are you doing? Magalia, how are you doing?

A. Good.

MR. HORWITZ: Are you nervous?

A. I'm nervous, yes, but I would—

MR. HORWITZ: Are you feeling okay enough to participate in the deposition?

A. Yes.

MR. HORWITZ: Okay. Let's go.

BY MS. HARRINGTON:

Q. When we took a break, you were describing who had locked the doors to leave the dealership. Who did you see lock a door?

A. I didn't see anything.

Q. Okay. Are you telling me that you did not see any person lock a door at the dealership which prevented you from leaving the dealership?

A. I did not see who locked the door but the door was locked because I tried to open it.

Q. Understood. Just to clarify, I think before we took the break then, you did not see a police officer lock any door at the dealership; is that correct?

MS. LEWIS: I'm going to object to that question because it was asked and answered and she said she did see a police officer lock the door very clearly.

MR. HOROWITZ: You don't like that? So you can answer the question, okay.

MS. LEWIS: Go ahead, she can go ahead and answer.

A. I'm sorry, what did you say?

MS. HARRINGTON: Can you reread the question, please.

(Whereupon the record was read …)

MS. LEWIS: Same objection.

A. There were some people there but I did not see that they locked the door.

BY MS. HARRINGTON:

Q. But specifically my question was you did not see a police officer lock any door at the dealership, correct?

A. It was a man that locked it.

Q. So you did see a man lock the door then; is that right?

A. Yes.

Q. Can you tell me what that man who locked the door was wearing?

A. No.

Q. Was the man who locked the door wearing a police uniform?

A. No.

*Id*. at 41:13-44:19. Improper coaching from Horwitz during the break is the only plausible explanation for Magalia's changed testimony.

Finally, returning to Onesimo's deposition, this is what happened when Harrington asked Onesimo about his cell phone number:

Q. And what is your cell phone number?

MR. HORWITZ: Hold on, what's the purpose for securing it?

MS. HARRINGTON: What is the purpose of securing it?

MR. HORWITZ: For a nonparty?

MS. HARRINGTON: There has been multiple contacts from multiple family members to X Motorsports and the Village of Villa Park Police Department.

MR. HORWITZ: Okay.

15

…

Q. What is the cell number?

A. 630-[redacted]-[redacted].

MR. HORWITZ: Are you planning on issuing a subpoena?

MS. HARRINGTON: If it hasn't already. It may have already.

MR. HORWITZ: I don't think I'm getting notice of these subpoenas which is required.

MS. HARRINGTON: Blake, you are getting notice of these subpoenas. These are going through Record Copy Service.

MR. HORWITZ: No, I'm not getting notice before it's issued.

MS. HARRINGTON: Blake.

MR. HORWITZ: I'm not getting notice before it's issued.

MS. HARRINGTON: I'm not going to have this argument with you now since I have a time constraint so we need to do it.

MR. HORWITZ: I don't care if you want to have an argument or not. I am saying to you on the record that I need to get a copy of the subpoena before it gets out. Record Copy Service is not me getting a copy of the subpoena before it is issued. The new rules require before issuance. Record Copy gives it to you later, okay, of the information after it's subpoenaed. Before it's issued I look at —

MS. HARRINGTON: Can we stop wasting time. I'm acknowledging your objection. Can we move on because he [Onesimo] has to leave, you have told me this, so can we just do our jobs.

MR. HORWITZ: Calm down.

MS. HARRINGTON: No.

MR. HORWITZ: You're not going to calm down? I'm making sure the record is clear, I haven't gotten a copy of the last subpoena. You've probably issued more subpoenas. That's not in compliance with the rule. I have had a judge strike subpoenas for not tendering it to opposing counsel ahead of time. Please make sure you follow the rules. Let's go.

MS. HARRINGTON: Are we done?

MR. HORWITZ: If I have something else to say.

16

Doc. 137 at 9:9-11:19.  There was no justification for Horwitz going on and on and on and on about subpoenas, as opposed to waiting until after the deposition to press the issue.  Harrington exercised admirable restraint in not commenting upon the irony—actually, the gall—of *Horwitz's* directing *her* to "calm down."

There often can be a fine line between zealous advocacy, which of course is allowed, and violating Rule 30(c)(2) and engaging in other obstreperous deposition conduct, which is not.  Horwitz's actions during Onesimo's and Magalia's depositions fall nowhere close to that line.  Sanctions are clearly in order.  As was the deposing attorney in *Redwood*, Horwitz is censured for conduct unbecoming a member of the bar.  476 F.3d at 470; *see also Amari Co. v. Burgess*, 2009 WL 1269704, at *1-*3, *5 (N.D. Ill. Apr. 30, 2009) (imposing sanctions where an attorney "made argumentative and suggestive objections" and instructed the witness not to answer "on grounds unsupported by Rule 30(c)(2)").  Monetary sanctions in X Motorsport's favor will not be ordered because Lewis, X Motorsport's attorney, crossed the line as well, albeit less seriously, as discussed next.

## II. Plaintiffs' Motion for Sanctions

Near the conclusion of Magalia's deposition, this happened:

> Q.  What did you do [when you worked] at Pampered Chef?
>
> MR. HORWITZ:  I'll allow these questions to continue on for a short period of time and then I'm going to instruct the witness not to answer is because it's counsel's intention to harass the witness.  What she did many years ago is irrelevant to this lawsuit.  We're not claiming lost wages or anything of that nature.  And I think your intention after me explaining to you quite clearly that my client is suffering from anxiety is designed to harass her.  Based upon the rules relative to harassment, I will instruct her not to answer and I'm going to see if the judge is available to have a conversation about it.  So choose what you want to do.

MS. LEWIS: Not that I need to explain my questions, however, you're the one who said she has a limited education and I'm trying to figure out how much she is capable of knowing and not. And I think her job would be slightly relevant. If you don't agree, that's fine.

MR. HORWITZ: As I said, I'll give you a couple—I'll give you a little latitude and that's it.

MS. LEWIS: Shut up. Shut up.

MR. HORWITZ: Let the record reflect counsel —

MS. LEWIS: Let the record reflect counsel is telling counsel to shut up. Yes, I am. There you go.

MR. HORWITZ: On three occasions defense counsel just told me to shut up. She's interrupting me while I'm talking. I have already indicated on the record my client's state. One more time, one more issue, I'll be—I'm seeking a protective order before the court.

MS. LEWIS: Ahhh.

MR. HORWITZ: Carry on.

MS. LEWIS: I think I might need some Lorazepam. Do you have any extra?

MR. HORWITZ: You just asked my client if she has Lorazepam. She's leaving. So she's going to leave and we're going to call the Court and advise the Court that you just asked my client if she has any extra Lorazepam.

MS. LEWIS: Okay.

MR. HORWITZ: You told me to shut up three times.

MS. LEWIS: Yes.

…

MR. HORWITZ: I'm getting the judge on the phone. …

MS. LEWIS: All righty. I shall be soon trying to get my partner involved in this case because it's not worth it to me —

MR. HORWITZ: We want you to.

MS. LEWIS: — dealing with someone like you. It's just horrendous. I find this to be the most horrific thing I have to deal with and I don't need to.

MR. HORWITZ: I don't want to get you in a back and forth.

> MS. LEWIS: I can talk whatever I want to say, okay. You just need to shut your big fucking mouth.
>
> MR. HORWITZ: Are we on the record? I'm leaving the room after counsel just swore at me.

*Id*. at 72:11-75:2.

Lewis acted improperly in telling Horwitz to "shut [his] big fucking mouth" and in sarcastically asking whether Magalia had any extra Lorazepam, a medication used to treat anxiety. *See Lorazepam*, WEBMD, http://www.webmd.com/drugs/2/drug-8892-5244/lorazepam-oral/lorazepam-oral/details. This is not to endorse Horwitz's charge that Lewis was mocking Magalia or her mental condition; in context, it is clear that Lewis's question about Lorazepam was intended not to mock Magalia, but rather to imply that Horwitz was driving Lewis to distraction. Lewis apologized during the deposition, Doc. 136 at 77:2-19, and again in her response brief, Doc. 142. (Horwitz has not apologized for his conduct.)

No doubt, Horwitz's behavior was maddening. He would not stop talking and obstructing. But it goes without saying that a lawyer should not tell opposing counsel to "shut up" or to "shut [his or her] big fucking mouth" during a deposition, or at any time, even when— *especially* when—opposing counsel is behaving unprofessionally. It also goes without saying that counsel should not say anything that could be interpreted by a witness as mocking her psychological condition—although, as noted, that was not Lewis's intent.

Plaintiffs' sanctions motion invokes the court's inherent authority. *See Ramirez v. T & H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016) ("[A] court has the inherent authority to manage judicial proceedings and to regulate the conduct of those appearing before it, and pursuant to that authority may impose appropriate sanctions to penalize and discourage misconduct."); *Tucker v. Williams*, 682 F.3d 654, 661-62 (7th Cir. 2012) (holding that a court has the inherent power to impose sanctions where a "party has willfully abused the judicial process or otherwise conducted

litigation in bad faith"). "Because of their very potency, inherent powers must be exercised with restraint and discretion," *Chambers v. Nasco, Inc.*, 501 U.S. 32, 44 (1991), and should be used to sanction attorneys "for actions taken in bad faith, vexatiously, wantonly, or for oppressive reasons," *Johnson v. Cherry*, 422 F.3d 540, 548-49 (7th Cir. 2005) (quoting *Chambers*, 501 U.S. at 45-46). Inherent authority sanctions must fit the misconduct and take account of context. Under the circumstances, Lewis's conduct requires an admonishment, nothing more. *See Redwood*, 476 F.3d at 470 (distinguishing between attorney conduct that warrants censure, a more serious sanction, from conduct that warrants only an admonishment).

## Conclusion

> Mutual enmity does not excuse the breakdown of decorum that occurred at [Onesimo's and Magalia's] deposition[s]. Instead of declaring a pox on both houses, the district court should … use its authority to maintain standards of civility and professionalism. It is precisely when animosity runs high that playing by the rules is vital. Rules of legal procedure are designed to defuse, or at least channel into set forms, the heated feelings that accompany much litigation. Because depositions take place in law offices rather than courtrooms, adherence to professional standards is vital, for the judge has no direct means of control.

*Redwood*, 476 F.3d at 469-70. For the foregoing reasons, the parties' cross-motions for sanctions are granted. Attorney Blake Horwitz is censured for conduct unbecoming a member of the bar. Attorney Jill Lewis is admonished for losing her temper and swearing at Horwitz in response to his own, more serious sanctionable conduct.

September 27, 2017

_____
United States District Judge

20